**In re SOUTHERN COMMODITY CORPORATION, Debtor.**

**Bankruptcy No. 85–01103–BKC–TCB.**

United States Bankruptcy Court, S.D. Florida.

Jan. 11, 1989.

See also, Bkrtcy., 85 B.R. 892.

Howard Berlin, Britton, Cassel, Schantz & Schatzman, Miami, Fla., for debtor.

Kelley, Drye & Warren including Smathers and Thompson, Robert O'Malley, Miami, Fla., for Official Liquidating Committee.

Dexter W. Lehtinen, U.S. Atty., Marilyn Koonce, Asst. U.S. Atty., Civ. Div., Miami, Fla., for U.S.

Jenkens & Gilchrist, Christie S. Flanagan, Dallas, Tex., for El Campo Rice Milling Co., Inc.

Weil, Gotshal & Manges, Lawrence D. Mungin, Houston, Tex., former attys., for El Campo Rice Milling Co., Inc.

## ORDER DENYING SUPPLEMENTAL FEE APPLICATION

THOMAS C. BRITTON, Chief Judge.

The motion to reopen this case (CP 247), filed by the Liquidating Committee which had been created in 1986 by the confirmation of a creditors' committee chapter 11 plan, had two objectives. It sought approval for the settlement of a 1987 preference judgment it had obtained in this court, and it asked that 96% of the $215,000 settlement proceeds be paid to the Liquidating Committee to reimburse its fees and expenses.

The motion was heard August 21, 1988. The case was reopened and the settlement was approved. However, ruling on the requested disbursement of the settlement proceeds was deferred for two reasons. (CP 249). The compensation requested by the Committee appeared grossly excessive and the only affected creditor had made no appearance or response to the Committee's proposed disbursement. (CP 247 at 3).[1]

The Committee had argued at the hearing that the silence of the affected creditor, the U.S. Customs represented by an Assistant U.S. Attorney, indicated approval of the Committee's requested disbursement. It appeared more probable to me that the Assistant was unaware of the Committee's motion. I, therefore, requested written confirmation from the U.S. Attorney that the Government accepts the Committee's motion. (CP 249).

The Assistant U.S. Attorney responded six weeks later that the Government opposed the Committee's request (CP 250). The Government did not appear at a second hearing held November 21 to consider the Committee's request. The Assistant U.S. Attorney has since requested that the settlement proceeds be divided equally between the priority creditor and the Committee. (CP 253a).

The Committee has opposed the Government's request. (CP 251, 254, and 255). In its last response, the Committee reported that it had "incorrectly totalled" its incurred expenses, that the correct total exceeds by 21% the figure it had previously reported, and, therefore, it now wants *all* of the settlement proceeds.

For the reasons which follow, the Liquidating Committee's request for additional compensation is denied.

### Events Preceding This Supplemental Fee Application

In January 1986, after six months' fruitless effort, the debtor withdrew its plan.

(CP 127). There being no unencumbered assets, the case faced dismissal. (CP 139).

As an alternative to dismissal of this case, the unsecured creditors' committee submitted a plan, subsequently confirmed, which called for the continued investigation of the debtor and the recovery of any preferential or fraudulent transfers detected in that investigation.

The debtor's president and vice president are in jail for fraud against the Department of Agriculture. The creditors' committee had been encouraged by the Government's indictment and successful criminal prosecution to believe that it could recover substantial fraudulent and preferential payments to creditors.

For its implementation, the plan created a Liquidating Committee appointed by and from the creditors' committee. That committee represented 90% of this debtor's general unsecured claims. The Government was not represented on or by the Committee.

The Committee's two-year effort to recover something for the unsecured creditors was a failure. Its total recovery fell well short of the Government's priority claim plus the accrued expense of the Committee's effort. To make matters worse, the money recovered by the committee was from unsecured creditors, who had received preferential payment from the debtor. The net effect of the Committee's effort, therefore, was to deprive *all* unsecured creditors of payment in order to pay the Committee's professionals who had accomplished that result.

In February 1988 the Liquidating Committee reported this result and requested reimbursement of its expenses. (CP 231, 232). It then reported its expenses to be $389,978: 40% for the accountant, Ernst & Whinney, 56% for its attorney, R. F. O'Malley, Jr., who had proposed the plan as the

---

**1.** The U.S. Customs has an allowed § 507(a)(7) priority claim of $202,000 (reduced from $1 million) which is subordinate in this case only to the administrative expenses which are approved by this court. (CP 192). There are over $10 million unsatisfied general claims. The Customs, therefore, is the only creditor *substantially* affected by the requested disbursement to the Committee.

attorney for the unsecured creditors' committee, and the remaining 4% for the committee members' personal expenses for travel, meals and lodgings to attend committee meetings. (CP 231, 232).

At that time it reported that it was then in the process of collecting a total of $195,098, not counting the judgment it has since settled for $215,000. There have been and will be no other receipts, other than interest earned on those funds. (CP 232).

By a May 1988 Order On Fee Application Of Liquidating Committee, I approved the Committee's application in the amount of the then entire cash balance of the estate plus any interest accruing before payment. (CP 244). I did so because the application was almost double the available funds and was unopposed. The Committee received $201,220 by that Order. (CP 255).

The May 1988 Order also provided that: "In the event the Liquidating Committee is ultimately successful in collecting anything from its judgment, it may, on notice to the Government priority creditor, reopen this case and apply again for additional consideration of its application. It would be a waste of this court's time to review the application in detail at this juncture to determine the precise reasonable amount of this application." (CP 244).

### The Committee's Fee Application

The Committee's February 1988 fee application (CP 231), includes attachments relating to the attorney's charges, the accountant's charges, and the personal expenses of three committee members. This is the only application before me. It leaves much to be desired.

To begin with, the charges of all the applicants *antedate by over a year the establishment of the Liquidating Committee* July 21, 1986. *All* of the personal expenses requested by the three Committee members were incurred before then.

Neither the predecessor unsecured creditors' committee nor the professionals it had hired in October 1985 (CP 98) had made any application for payment for their services in that capacity when a February 1986 deadline for such applications was ordered. (CP 121). Nor was there any application under § 503(b)(3)(D), if these expenses had been advanced by creditors.[2]

The confirmed plan contains no provision for payment to either the members or the agents of the chapter 11 unsecured creditors' committee or for reimbursement of any funds advanced for that purpose.

Secondly, the employment of an accountant for the Liquidating Committee was never authorized. The employment by the Liquidating Committee of the attorney for unsecured creditors' committee was authorized by the plan. (CP 191 at 8). The employment of other agents, including an accountant "upon application and approval by the court" was also authorized (CP 191 at 9), but no authorization was ever sought or given for the accountant's employment. The employment of professionals in bankruptcy requires court approval. § 327(a), § 1103(a), § 1107(a).

Thirdly, the application for fees paid to the Committee attorney does not meet the requirements specified in B.R. 2016(a) and in *In Re Beverly Manufacturing Corp.*, 841 F.2d 365, 369–70 (11th Cir.1988). It consists of ten billing statements (90 unnumbered pages not arranged in chronological order) covering periods between August 28, 1985 and the end of 1987. Each billing lumps together all the services furnished and the time spent for the billing period, typically three months. This was the specific deficiency of the fee application found to be inadequate in *Beverly, supra* at 370.

The personal expenses of the three committee members (four pages) totalling $16,216 are also completely undocumented.

---

**2.** There were no unencumbered assets in this case, but it is not clear whether the fees of the professionals were advanced by creditors or whether they assumed the risk of not being paid. These subsections grant administrative priority to reimburse creditors who have made "a substantial contribution" in the case.

*Discussion*

■ There is no statutory authority nor any authorization in the confirmed plan to charge this estate now for any administrative expense other than those reasonably incurred by the Liquidating Committee. There is no implied or equitable power given this court to exceed statutory authority in the distribution of bankruptcy estates.

As was stated in *In re Fox*, 725 F.2d 661, 663 (11th Cir.1984):

"Although § 105 confers broad equitable powers upon the bankruptcy courts, 'it is still doctrine that expenses and allowances by the bankruptcy court shall be limited to statutory allowances.... [s]ince Congress has determined who may be reimbursed and compensated, an equity court may not enlarge upon legislation which is both an expression of policy and unambiguous.' *In re FAS International*, 382 F.Supp. [77] at 81 [S.D.N.Y. (1974)]; see also *In re Fidelity Mortgage Investors*, 690 F.2d 35, 40 (2nd Cir.1982).

■ It follows that payment for services furnished *before* the Liquidating Committee was established and payment for accounting services which were *never authorized* for the Liquidating Committee must be disallowed.

The billings of the accountant, including expenses, total $102,542 of which $80,435 were for services after the Liquidating Committee was established. No part of these expenses may be reimbursed.

The billings of the attorney total $291,-931. (CP 231).[3] Deducting billings for services before July 21, 1986, the date the plan was confirmed, the Committee was created, and the attorney's employment by the Committee was authorized, leaves $177,998.[4]

■ The Committee's August 1988 motion to reopen the case and allow supplemental reimbursement to the Committee states that a total of $408,032 fees and expenses have been incurred. (CP 247 at 3). This figure exceeds the $389,978 total reflected in the Committee's February 1988 report and application. (CP 231 at 5). The difference, $18,054, presumably includes the expense of negotiating a settlement of the El Campo judgment, the only services which remained after February 1988.

If so, it is unreasonably excessive. That judgment, *In re Southern Commodity Corp.*, 78 B.R. 626 (Bankr.S.D.Fla.1987), which was affirmed by the District Court in February 1988, was settled for 78% of the amount due based upon defendant's ability to pay. Reaching that determination should not have cost more than $2,000.

■ But in any event, it is the Committee's burden to justify its fee application. *In re Beverly Manufacturing Corp.*, supra, at 369. It has offered *no* explanation or justification for this additional expense. It is, therefore, disallowed.

■ The personal expenses of the Committee members must also be disallowed because they all antedated the Committee's establishment. The only Circuit to have addressed the question has held that the personal expenses of creditors' committee members cannot be charged directly or indirectly against the estate. *Matter of UNR Industries, Inc.*, 736 F.2d 1136, 1139 (7th Cir.1984). I would disallow this expense even if it had been incurred by the Liquidating Committee.

■ At best, therefore, the Committee is entitled to reimbursement of $177,998, the sum it advanced to its attorney for services after the Committee came into existence. Because it has already been paid $201,220, I will not extend this analysis further.[5]

3. The Committee's February 1986 application (CP 231 at 5) stated this figure to be $218,133. Its most recent pleading, acknowledging an error, states the figure to be $264,538. (CP 255). I give the Committee the benefit of my addition.

4. The attorney's billings include both fees and expenses. Because the billings for April 11 to September 8, 1986, are lumped together I have prorated those billings as of July 21, 1986 in arriving at this figure.

5. The fee is clearly disproportionate to the results achieved, that is to say, the benefit to the class of unsecured creditors represented by this attorney and the benefit to the Government in the recovery of the funds necessary to satisfy its priority claim. The billings include charges for expenses, at least $4,779 of which appear to me

Since the Government has never either questioned or opposed the prior excessive payment, I will require no repayment. Although the Government now asks only half of the El Campo settlement ($215,000 plus accrued interest), I cannot in good conscience authorize or direct any part of that fund to be paid to the Liquidating Committee.

The Committee's request for additional reimbursement is denied. The Committee is directed to satisfy the Government's priority claim forthwith, by payment in full, and to distribute the rest in accordance with the statute.

A final word is appropriate. Nothing in this decision is intended as criticism of the ability, diligence, or the conduct of the Committee members, their attorney, or their accountant in attempting to serve the interests of the unsecured creditors. So far as I am aware all of them did all that reasonably could be done to attempt recovery for that class, and the charges made to the major unsecured creditors who hired and paid them do not appear unreasonable.

As was noted in *Matter of Multiponics, Inc.*, 622 F.2d 731, 734 (5th Cir.1980), one must distinguish between those services beneficial to the estate and those beneficial primarily to the class of creditors served by the professionals:

> "The former, the District Court explained, were proper expenses for which compensation was due from the estate, while the latter were not.... Rather than indicative of an abuse of discretion, such reasoning is eminently reasonable."

This Order is concerned solely with the charges due from this estate.

DONE and ORDERED.

to be included as overhead costs within the    attorney's fee charges.